**Application of Alford G. FARNHAM, Francis N. Apel and Howard L. Bender.**

**Patent Appeal No. 7244.**

United States Court of Customs and Patent Appeals.

March 18, 1965.

Walter C. Kehm, New York City (John F. Hohmann, New York City, Paul A. Rose, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (J. F. Nakamura, Washington, D. C., of counsel), for Comr. of Patents.

---

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Appellants have correctly referred to the issue on this appeal as "a classical Section 103 rejection on the question of whether the differences between appellants' invention and the prior art is [sic] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in this art."

The invention disclosed in appellants' application [1] and claimed in appealed claims 1–8, 10 and 11 [2] relates to a process for the production of a bisphenol by the known condensation reaction between a phenol and a ketone to produce, e. g., 2,2–bis(4–hydroxy-phenyl) propane, which will hereinafter be referred to by its commercial designation "Bisphenol A."

As stated in appellants' brief:

"The condensation reaction of phenols with ketones has been known for 20 or more years. The major in-dustrial process for the reaction is one employing an acidic catalyst such as hydrochloric acid. Much of the Bisphenol-A produced in the U. S. to-day is made by such a process. The use of mineral acids as catalysts in the process, however, has created problems in product purity as well as in subsequent by-product and cata-lyst removal. Corrosion problems in handling and manufacturing equip-ment for use with such strong acid catalysts in the presence of water added to such problems as did the adverse effects upon the rate of re-action due to the dilution of the acid by the water formed in the reaction. While these problems have not been unsurmountable, they have proven to be expensive and create extensive purification requirements on the process."

Appellants' process uses a cation ex-changing resin as the catalyst instead of the soluble acid catalyst heretofore em-ployed. The Board of Appeals affirmed the rejection of the appealed claims as covering but an obvious modification of the process disclosed in

| Stroesser et al. | 2,623,908 | December 30, 1952 |

The other references cited are:

| Jansen | 2,468,982 | May 3, 1949 |

"Amberlite Ion Exchange," p. 10, Rohm and Haas Co., The Resinous Products Div., Philadelphia (September 1953)

Sussman, 38 Industrial & Eng. Chem. 1228–30 (1946)

The board also took note of the following text, which was made of rec-ord in the first office action:

Nachod et al., Ion Exchanging Technology 273–79 (Academic Press, N.Y. 1956)

———◆———

1. Ser. No. 706,295, filed Dec. 31, 1957 for "Preparation of Bisphenols."

2. Claims 2 and 3 which are representative of the claims on appeal read as follows:
   "2. A process for the production of bisphenols which includes the steps of contacting a mixture of a phenol hav-ing a reactive hydrogen para to the phenolic hydroxyl and a ketone having at least one methyl group alpha to the carbonyl, said mixture containing at least three molar parts of said phenol per molar part of said ketone, with a substantially insoluble cationic-exchang-ing resin at a temperature between about 40°C. and 150°C. for a time suf-ficient to form a bisphenol by the re-action of the said phenol with the said ketone, and thereafter recovering the bisphenol from the resulting mixture.
   "3. A process as described in claim 2 wherein the insoluble cationic ex-change resin has been treated so as to be substantially free of water."

The examiner stated in the final rejection that he was aware that no reference anticipated the claims and that each reference contained disclosure not pertinent to the claims. It was his position, however, that the cumulative disclosures of the prior art were such at the time of appellants' invention to make it obvious to a person of ordinary skill in this art. Appellants' position as here summarized in their brief traverses this position and argues that the positions of the examiner and the board are incorrect "in that those of ordinary skill in this art with the references before them *would not be taught* that ion exchanging polymeric resins would catalyze the condensation reaction between phenol and acetone in this process."

There is no question but that the Stoesser process produces Bisphenol A by reacting phenol with acetone in the presence of a volatile acidic condensing agent. The reference discloses that the reaction may be carried out with stirring at temperatures preferably from 40° to 70° C. and also may be carried out at higher temperatures up to 100° C. It discloses further that the bisphenol forms as crystals in the reaction mixture.

Stoesser also points out that the "process may advantageously be carried out by procedure which involves feeding the phenol and the acetone in the desired proportions to a reaction zone, * * * [and] intermittently, or continuously, withdrawing crude reaction product from the reaction zone * * * ."

Jansen discloses a process for preparing the bisphenol 2,2–bis(4–hydroxyphenyl) propane by carrying out the acid condensation of phenol with acetone in the usual manner, but in the presence of a mercapto acid, such as beta-mercapto propionic acid, as a catalyst for accelerating the reaction. The reaction is carried out in the presence of anhydrous calcium chloride and hydrochloric acid (Example I), hydrochloric acid (Example III) or anhydrous hydrogen chloride (Examples IV to VII) as an acidic condensing agent. The reaction is carried out in a batch operation by mixing the phenol and acetone in a reaction vessel, adding the mercapto acid catalyst and acidic condensing agent and stirring the reaction mixture. The patent points out that normal operating temperatures of about 20° to 50° C. are preferred, but that the reaction may be effected at temperatures as high as 100° C. or higher.

The article by Sussman discloses that acid-regenerated cation exchangers, in the absence of any ionizable salt, catalyze a wide variety of reactions normally carried out with acid catalysts. The cation exchangers disclosed are "Zeo-Karb H," a sulfonated coal type, and phenol-formaldehyde types of resins containing sulfonic acid groups. The presence of strongly acidic groups is stated to be the necessary characteristic of a cation exchanger for catalysis.

The Amberlite Ion Exchange publication of Rohm & Haas Co. states under the heading, "Catalysis by Acids and Bases," that "Amberlite" ion exchange resins are "solid" acids or bases, and that the resins are ideal for many reactions catalyzed by acids or bases.

The excerpt from Ion Exchange Technology, a text and reference work by F. C. Nachod et al., points out several advantages in the use of ion exchange resins as acid catalysts. Among those advantages are: (1) A catalyst-free product is obtained by a simple filtration step and eliminates costly and difficult neutralization, precipitation, distillation and extraction steps. (2) Side reactions can be kept to a minimum. (3) Corrosion resistant equipment is not as necessary as in the case of some soluble catalysts. (4) Continuous processing can be obtained by passing the reactants through beds of ion exchange resin catalysts. Nachod et al. also point out that "These materials would be expected to have catalytic properties similar to soluble salts of sulfuric acid or salts of carboxylic acids and this expectation has been confirmed," and that the "reactions catalyzed by soluble salts and acids are also catalyzed in a similar manner by cation exchange materials."

Appellants' position in summary is:

The use of the synthetic resinous cation exchanging materials in the practice of the invention described and claimed by appellants is submitted to be a genuinely new and novel use of these materials that would not have been obvious to anyone skilled in the art at the time at which the invention was made. Prior to appellants' invention, the only known materials that could catalyze this reaction were the strong mineral acids such as characterized by the Stoesser et al reference and the Jansen reference.

Appellants attack the position of the examiner and the board as being essentially a "hindsight" rejection resulting from their selection of portions of the prior art "clearly guided by appellants' specification." We do not agree with this position. It seems to us that a person of ordinary skill in this art should be charged with the knowledge of the references as to the availability and use of ion exchange resins in catalyzing chemical reactions and that, as stated by the board:

"* * * Although the specific reaction claimed is not disclosed by these secondary references, we see no reason to believe it would not be operative when catalyzed with an acidic resin instead of free acid. Obviousness under 35 U.S.C. 103 does not require absolute predictability. In re Moreton, 48 CCPA 875; 1961 C.D. 277; 771 O.G. 295; 288 F.2d 708; 129 USPQ 227."

It appears, however, that appellants' invention does in fact involve something more than the selection of a known catalyst and its use in place of another in a known reaction to produce Bisphenol A. Appellants appear to have discovered that the desired reaction required pre-treatment of the ion-exchange resin catalyst to reduce its moisture content before it could be successfully used in the process. This pre-treatment is disclosed in the specification and provides an important basis from which appellants attack the position of the examiner and the board. Thus in discussing Sussman's coal exchanger, appellants point out in their brief:

"* * * Its water content even in the air dried condition of 15–30% *stops the reaction dead*—indeed it prevents it from even starting. Example 5 of appellants' specification (R. 14–15) shows that *at only 3% water, the reaction gave no conversion of acetone.*"

They also point out, quite correctly, that Stoesser et al. state they can use 10% water with their reactants and can use hydrochloric acid which appellants assert contains 63% water in its most concentrated form. The discovery of the deleterious effect of water in the ion-exchange resins when used in the disclosed reaction appears from the record to be an important aspect of appellants' process. It is stressed by appellants as an essential difference between the prior art teachings and the disclosed process. The examiner admits that "the references do not disclose that the resin should be freed from water prior to use in the reaction."

We do not agree, however, with the reasoning of the examiner that:

"* * * Since it is apparent that Stoesser used a dry catalyst and that the pressure [sic: presence?] of water in the reaction serves no useful purpose, the use of a dry resin in the process is indicated."

While not expressly stated in the board opinion, it seems that some such view necessarily underlies its affirmance of the examiner's rejection. We think appellants' recognition of the necessity for low water content in the catalyst is an important and unobvious contribution to this art. We think the examiner and the board erred in failing to treat each appealed claim separately.

Considering the claims on appeal separately, we find reference to the substantially water-free condition of the cationic

exchange resin only in claims 3, 7 and 8. We therefore affirm the rejection of claims 1, 2, 4–6, 10 and 11 and reverse the rejection of claims 3, 7 and 8.

Modified.