52 CCPA
**Application of Francis N. APEL, Louis B. Conte and Howard L. Bender.**

**Patent Appeal No. 7245.**

United States Court of Customs and Patent Appeals.

March 18, 1965.

Martin and Almond, JJ., dissented.

Walter C. Kehm, New York City (John F. Hohmann, New York City, Paul A. Rose, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (J. F. Nakamura, Washington, D. C., of counsel), for Comr. of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

The issue here, as in companion appeal PA 7244, 342 F.2d 455, arises under 35 U.S.C. § 103 and requires us to determine whether the differences between appellants' invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in this art.

The process disclosed in appellants' application [1] and claimed in appealed claims 1 through 6 reacts phenols and aldehydes to produce alkylidene bisphenols, the reaction being catalyzed by a cation exchanging resin. The cation exchanging resin is used as a condensation catalyst, in lieu of the strong mineral acids previously so used in known commercial practice. Commercially available cation exchange resins such as "Amberlite XE–100" and "Dowex 50–X–4" are disclosed as effective catalysts. The resin, if wet, is dried, for example under a vacuum or in an oven, but preferably by displacement of the water with phenol. The molar ratio of phenol to aldehyde in the reaction mixture is disclosed as more than 2:1 and preferably from 6:1 to 12:1. The process is carried out at temperatures of from 65° to 98° C. in a continuous column operation, and at tempera-

---

1. Serial No. 768,093, filed October 20, 1958.

tures of from 40° to 98° C. in a batch operation.

The rejection of the appealed claims was affirmed by the Board of Appeals which found the invention to be obvious in view of the following references:

DeGroote et al. 2,499,361 Mar. 7, 1950
Jansen 2,468,982 May 3, 1949

"Amberlite Ion Exchange", p. 10, Rohm and Haas Co., The Resinous Products Div., Philadelphia, Sept. 1953.

Appellants' position as stated in their brief is:

"The process now provided by appellants' invention, *for the first time provides* a system whereby high purity bisphenols can be secured in a rapid reaction without the concomitant problems of by-product formation, the separation of soluble acid catalysts and the use of corrosion resistant equipment. The invention also provides, *for the first time,* a system which is continuous by passing a reaction mixture of the aldehydes and the phenols through a packed bed of the cation exchanging synthetic resin to secure a conversion of the reactants to the bisphenols."

Appellants refer to claims 1, 4 and 6 as typical of those on appeal. These claims are as follows:

"1. A process for the production of bisphenols from a phenol reactive in the para position and a saturated aldehyde which comprises contacting a mixture comprising said phenol and an aldehyde in a molar ratio of more than 2 to 1 with catalytic quantities of a cation exchanging resin at a temperature of less than about 100° C.

"4. The process claimed in claim 3 wherein the cation exchanging resin is anhydrous.

"6. A continuous process for the production of bisphenols from a phenol and an aldehyde which comprises forming a mixture of a phen-

ol having a reactive hydrogen in the ring position para to the phenolic hydroxyl and an aldehyde free of olefinic unsaturation in a molar ratio of at least 3 to 1, contacting said mixture with a cation exchanging resin saturated with said phenol in a reaction zone maintained at a temperature between about 65° C. and 95° C., drawing off the bisphenol product and the unreacted phenol and aldehyde, separating the bisphenol therefrom, recharging the phenol aldehyde mixture with additional phenol and aldehyde, and again contacting said mixture with said cation exchanging resin."

The rejection of the claims is based primarily on DeGroote in view of Amberlite. The DeGroote patent relates to (1) the preparation of diphenylolmethanes from an aldehyde and a phenol, (2) the preparation of oxyalkylated derivatives of diphenylolmethanes. The patent discloses a process for preparing a diphenylolmethane from o-cresol and heptaldehyde in a molar ratio of 2:1.05 by adding the aldehyde to the phenol and 4 pounds of sulfuric acid, refluxing for 1 hour at 100°–110° C. following a rapid drop in temperature from an initial rapid rise to 140° to 160° C., adding 100 pounds of xylene and distilling off the water of reaction. DeGroote points out that the phenol to aldehyde molar ratio of 2:1.05, rather than the theoretical 2:1 ratio, is "desirable" to yield the maximum amount of diphenylolmethane, and that a higher molar ratio (excess of phenol) " * * * merely results in incomplete combination of the phenol." The product in xylene solution is dark red and soft-to-fluid.

The Amberlite publication, under the heading "Catalysis by Acids and Bases," discloses that "Amberlite" ion exchange resins are in the nature of "solid" acids and catalyze many reactions catalyzed by acids. A number of reactions are pointed out, including the reactions of formal-

dehyde and styrene to yield 4–phenyl–1,3–dioxan, and phenol and isobutylene to yield t-butyl phenol. The publication discloses the advantages of separating the resins from reactants or products by simple filtration or decantation, and of eliminating the requirement for neutralization, as with soluble acids, and the need for acid-resistant equipment.

Jansen is directed to the soluble acid catalyzed condensation of phenols with ketones in the presence of a mercapto substituted aliphatic carboxylic acid. The examiner relied upon the showing in Example 10 of the use of formaldehyde and phenol in securing a product which the reference says contains methylene bisphenol.

The principal contribution to the art made by Jansen appears to lie in the increased catalytic effects resulting from the use of the mercapto aliphatic acids as catalytic aids. It was applied against the appealed claims as showing the use of formaldehyde with a molar excess of phenol with an acidic catalyst.

While the subject matter of the present appeal is related to the subject matter of the companion appeal (PA 7244), we are here concerned with different claims to a different process and with different prior art. As pointed out by the Board of Appeals:

> " * * * The instant application differs from Appeal No. 422–37 [PA 7244] in that an aldehyde rather than a ketone is employed for condensation with a phenol in order to produce bisphenol. * * "

While both the application here in issue and that in the companion appeal relate to processes for the production of bisphenols employing a cation exchange resin to catalyze the reaction, we agree with the position stated in appellants' brief that "it was error to apply the same reasons of rejection here as in the companion docket D–7244 since [the] references are different and the reaction is different."

It is apparent from the above that the examiner properly considered that the DeGroote reference alone is not an effective anticipation and that reliance on the Amberlite and Jansen references was necessary to supply some of the deficiencies of DeGroote. The question thus posed is whether the teachings of these combined references made the invention as a whole, *as claimed in the appealed claims*, obvious under section 103. We think they did not.

DeGroote does not teach the use of the molar ratios of phenol to aldehyde specified in the appealed claims. Thus, claim 1 requires a molar ratio of "more than 2:1," and claims 2 and 6 specify a molar ratio of "at least 3:1" while claims 3, 4 and 5 call for ratios of "from 6:1 to 12:1." DeGroote, on the other hand, makes the following statement:

> "Use of an appreciably smaller ratio of aldehyde to phenol than 1 to 2 merely results in incomplete combination of the phenol, the amount remaining uncombined contributing little or nothing to the value of the product and at the same time raising its cost. Therefore, reactant proportions should be quite closely adhered to, and should be of the order of those just recited above."

This passage would, if anything, tend to lead one skilled in the art away from appellants' claimed molar ratios.

As to the importance of the molar ratios claimed, appellants' specification states:

> "It is necessary in the process of this invention to utilize more than stoichiometric amounts of phenol to aldehyde in the reaction zone. Generally at least 3 moles and up to about 20 moles of phenol per mole of aldehyde is suitable. It is preferred, in order to achieve higher conversions and greater efficiency, to employ mole ratios of phenol to aldehyde between about 6:1 and 12:1. The reaction of the phenol and aldehyde to the corresponding bis-

phenol with the cationic exchange resin catalysts hereinbefore described is preferably accomplished by contacting a mixture of a phenol and an aldehyde, containing 6 to 12 moles of phenol per mole of the aldehyde, with an amount of phenol modified-ion exchange resin catalyst sufficient to provide 1 mole equivalent of acid per mole of aldehyde at a temperature between 65° and 95° C., for a time sufficient to yield at least a 50% conversion of the reactants to bisphenol. The time during which the reactants are in contact with the catalyst, or the residence time, determines the per cent conversion for a given resin."

The importance of the claimed temperature conditions is likewise set forth in the specification:

"The ion exchange resin of this invention is generally effective at moderate temperatures of about 40° to 100° C. Temperatures above 100° C. are not necessary or particularly advantageous since the rate of by-product formation appears to increase rapidly above this temperature and no corresponding increase in rate of bisphenol production or total bisphenol yield occurs. At temperatures above 100° C., it is also possible that some of the polymeric catalysts could be degraded, significantly lowering their useful life."

Nor do we think the Jansen reference suggests appellants' claimed molar ratios. While it is true that Example X of Jansen shows a ratio of phenol to aldehyde which falls within the range claimed by appellants, it is also true that Jansen is directed to the use of *a particular type of catalyst* for this reaction, which catalyst is in no way related to appellants' cation exchanging resin. We think this difference in catalysts is highly significant and destroys much of the pertinence of Jansen's teaching of molar ratios to appellants' invention. Cf. Corona Cord Tire Co. v. Dovan Chem. Corp., 276

U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928). And, we might add, the same reasoning applies with equal effect to the teachings of the DeGroote reference.

Thus, when the claimed subject matter as a whole is considered, including not only the particular catalyst used but the claimed temperature conditions and molar ratios as well, we think the cumulative differences over the prior art are such that appellants' invention would not have been obvious to one of ordinary skill in this art.

The decision of the board is accordingly reversed.

Reversed.

MARTIN, Judge (dissenting, with whom ALMOND, Judge, joins).

In the related case, In re Farnham, (PA 7244), 342 F.2d 455, 52 CCPA ——, we held that:

"* * * It seems to us that a person of ordinary skill in this art should be charged with the knowledge of the references as to the availability and use of ion exchange resins in catalyzing chemical reactions and that, as stated by the board:

"* * * Although the specific reaction claimed is not disclosed by these secondary references, we see no reason to believe it would not be operative when catalyzed with an acidic resin instead of free acid. Obviousness under 35 U.S.C. 103 does not require absolute predictability. In re Moreton, 48 CCPA 875; 1961 C.D. 277; 771 O.G. 295; 288 F.2d 708; 129 USPQ 227."

The single reason for reversing as to claims 3, 7 and 8 was because those claims called for a pretreatment of the catalyst to reduce its moisture content to below 3% (as disclosed in the specification). We stated:

"* * * Appellants appear to have discovered that the desired reaction required pre-treatment of the

ion-exchange resin catalyst to reduce its moisture content before it could be successfully used in the process.
\* \* \*

\*  \*  \*  \*  \*  \*

"\* \* \* We think appellants' recognition of the necessity for low water content in the catalyst is an important and unobvious contribution to this art. \* \* \*"

I might add that that contribution was the one evident on the basis of the record before us.

The present appeal differs from the former in that one reactant is an aldehyde rather than a ketone. The differences in reactivity are well known in the art as seen in the Jansen reference. Jansen was concerned with the "condensation of a phenol with a carbonyl compound. especially a ketone." He also found that:

\* \* \* the acid condensation of phenols with formaldehyde, as well as other aldehydes such as acetaldehyde, propionaldehyde, butyraldehyde, benzaldehyde and the like is catalyzed by the presence of the above-described catalyst. Such condensations are inherently much more rapid than ⌐ondensations of phenols with keton⌐s and much more likely to lead to resin formation and as such are not generally considered

equivalent to condensation of phenols with ketones. However, they are effected even more rapidly by the catalysts of this invention, although, of course, because of their more rapid nature, the advantage in using a catalyst is not so pronounced."

Jansen's claims call for carbonyl compounds, which is inclusive of aldehydes and ketones.

The majority opinion in the present case hinges allowance of all the claims on the temperature and mole ratio limitations. That I think is in error. The following table will be helpful in noting the "differences between the subject matter sought to be patented and the prior art." I think the proper approach is to compare the appealed *claims* with the *examples and disclosure of the references*. The *similarities* ought to be considered in order to show that the *differences* between the claims and the most similar prior art are such that the subject matter is unobvious, if indeed that is so. Since some terms in the appealed ⌐laims are not self-defining, I have added a column headed "Appellants' Specification" to show the scope intended to be covered by such terms.

It is clear that there are three differences, the catalyst, the mole ratios, and the temperature. That the application of the catalyst to this process would be ob-

|  | De Groote | Claim 1 | Appellants' Specification |
|---|---|---|---|
| ALDEHYDE | "\* \* \* formaldehyde \* \* Its homologues \* \* \* butyraldehyde, and heptaldehyde, are obvious equivalents" | "a saturated aldehyde" | "aldehydes \* \* \* from 2 to 12 carbon atoms" |
| PHENOL | "\* \* \* monocyclic phenols \* \* \* also required to be monohydric \* \* \*" "O–Cresol" | "a phenol reactive in the tion" ¹sod ɐɹɐd para posi- | "\* \* \* phenols \* \* \* with or without one or more substituents in the position ortho and meta to the phenolic hydroxyl \* \* \* ortho and meta cresol" |

|  | De Groote | Claim 1 | Appellants' Specification |
|---|---|---|---|
| RATIO PH/ALD. | "molal," 2/1.05 | Molar<br><br>"more than 2 to 1" | "* * * more than stoichiometric amounts * * * Generally at least 3 * * * preferred * * * about 6:1 and 12:1 * * *" |
| CATALYST | conc. HCl<br>conc. $H_2SO_4$ | "a cation exchanging resin" [not phenoldried or anydrous] | "* * * The water content can be as much as 50 to 100% by weight based on the dry resin * * * It is preferred * * to remove this water * * *" |
| SOLVENT | None. "* * * in general, preparation of the diphenylolmethane may be accomplished merely by reacting the phenol and the aldehyde in absence of inert solvent." | Silent | None — [water distilled off.] |
| TEMPERATURE | "* * * The reaction is decidedly exothermic, the temperature rising rapidly to from 140°C to 160°C before beginning to fall rapidly with formation of water of reaction to 100–110°C"; "Heating is stopped at 130°C * * *" | "less than about 100°C" | "* * * moderate temperature of about 40° to 100°C. Temperatures above 100°C are not necessary or particularly advantageous * * * " |
| PRODUCT | "* * * diphenylolmethanes prepared from certain phenols and aldehydes * * *" | "bisphenols" | "* * * bisphenol or phenolbisphenol complex * * *" |

vious to one of ordinary skill in this art is evident from our holding in the companion appeal, In re Farnham, supra. I turn then to the remaining limitations.

Temperatures less than 100° C. are shown in Jansen for ketones, and aldehydes are stated to react more rapidly, therefore temperatures should be *at least* no higher, thus suggesting temperatures within the terms of the claims. Further, there is some overlap in the temperature with the DeGroote reference for claim 1 which calls for a temperature of "less than *about* 100° C" [emphasis supplied].

Jansen was relied on to support the position that use of an excess of phenol would be obvious. He states:

"The proportion of the phenol and ketone reactants, of the acid con-

densing agent and of the catalyst may be varied widely. In general, a molecular excess of phenol, that is, more than two molecular proportions of phenol for each mole of ketone, is advantageous, best results being secured when about 4 to 8 moles of phenol are used for each mole of ketone. The proportion of the acid condensing agent is in no way critical but ordinarily about 0.1 to 0.5 mole of condensing agent is used for each mole of ketone reactant. When anhydrous hydrogen chloride is used as the acid condensing agent, it is most convenient to saturate the reaction mixture therewith."

We keep in mind the relationship between ketones and aldehydes taught in that reference. Jansen then discloses in his Example X the reaction of 8 moles of phenol with 1 mole of formaldehyde, as acknowledged by appellants' brief.

The real difference in mole ratios relied on by the majority opinion arises from Jansen's use of a different catalyst. The majority states:

" * * * We think this difference in catalysts is highly significant and destroys *much* of the pertinence of Jansen's teaching of molar ratios to appellants' invention." [Emphasis supplied.]

I think that the teachings of the references referred to above indicate that the present temperature and mole ratio limitations of the claims are no more than those resulting from the routine experimentation which one of ordinary skill in the art would determine in finding the optimum conditions in the operation of the process. There is no real showing of criticality in those limitations.

Concerning the instant catalyst, "a cation exchanging resin," we know:

" * * * The catalytic properties of ion-exchange materials have been known for many years, and the newer ion-exchange resins have recently been investigated. The strongly acidic sulfonic acid cation-exchange resins have been shown to be effective as an esterification catalyst for most homogeneous or heterogeneous acid-catalyzed reactions. The strongly basic anion-exchange resins have also been shown to be effective base catalysts. The advantages of the ion-exchange resins as catalysts over the convention soluble acids and bases are: (1) the resulting products are not contaminated by the catalyst, (2) the catalyst can be used over and over again, and (3) the resin catalysts may frequently cause fewer side reactions." [1]

The application of that catalyst to the old reaction of phenol with aldehyde was correctly stated in the companion appeal to be obvious. I do not think the application of cation exchange resins to the instant reaction can "destroy" the pertinence of the teaching of Jansen as to mole ratios. The majority opinion admits as much, stating only that "much of the pertinence" is destroyed.

It is clear that in no single element, including the dried resin, is there criticality for the reaction of aldehydes with phenols. The whole concatenation does not impress me as being beyond the skill of the art, as exemplified by the references of record. The companion case In re Farnham, supra, showed a criticality in the dried resin which determined whether or not the process would operate. The claims in that case which defined an operable process, by reciting the pre-dried resin, were held to be patentable over the art of record. No such criticality exists here. The two cases should be consistent.

The majority opinion in this case seems to stand for the proposition that although it is obvious to use a well-known catalyst, the cation exchange resin, to catalyze a well known reaction, the process becomes an unobvious one upon the determination of two operational parameters, temperature and mole ratios,

1. Encyc. of Chem. Technology, Vol. 8, Kirk et al. ed. (1952), pp. 16–17.

although neither is critical to the operability of the reaction with the particular catalyst. I cannot agree and would affirm the rejection of all the claims here as obvious variations of the cited art.