**BRUNSWICK CORPORATION, Plaintiff,**

v.

**FILTERS, INC. (LOUISIANA) Filters, Inc. (Texas), and Filterspun, Inc., Defendants.**

C. A. No. H–81–903.

United States District Court, S.D. Texas, Houston Division.

Aug. 9, 1983.

Guy L. McClung, Fulbright & Jaworski, Jefferson D. Giller, Fulbright & Jaworski, Houston, Tex., John G. Heimovics, Skokie, Ill., for plaintiff.

Ely Silverman and Elsie Silverman, Silverman & Silverman, Amarillo, Tex., K. Allan Davis, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### Introduction

Plaintiff, Brunswick Corporation ("Brunswick") brought this suit against defendants Filters, Inc. (Louisiana), Filters, Inc. (Texas) and Filterspun, Inc. for infringement of United States Patent No. 3,624,779 (the " '779 Patent"). Brunswick alleges that defendants' willfully and deliberately infringed the '779 Patent and that defendants' conduct throughout this litigation has been so extraordinary and exceptional as to warrant both an award of treble damages and attorneys' fees. Defendants deny infringement and claim that the '779 Patent is invalid under 35 U.S.C. §§ 101–103. Defendants counterclaim that Brunswick's filing and pursuing this suit improperly restrains competition; that prior art limits the patent's scope so that defendants' accused filter units do not infringe it; and that the patent is invalid.

After severing the damage issues, this cause was tried to the Court without a jury from November 30, 1982 until December 21, 1982. At the conclusion of the evidence, the Court made some preliminary observations, requested additional briefing by the parties in the form of proposed findings of fact and conclusions of law and took the case under advisement. Pursuant to Rule 52(a), Fed.R.Civ.P., the Court now renders its Findings of Fact and Conclusions of Law detailing the reasons for its conclusion that the '779 Patent is valid and that defendants willfully and deliberately infringed the '779 Patent. The Court finds also that this is an exceptional case. Additionally, the following Findings of Fact and Conclusions of Law reflect the Court's conclusion that defendants have failed to prove any of their counterclaims and, accordingly, Brunswick should prevail in all respects.

### Findings of Fact

1. Plaintiff Brunswick Corporation is a Delaware corporation having its principal place of business in Skokie, Illinois. Admission of Fact.

2. Defendant Filters, Inc. (Louisiana) was a Louisiana corporation having its principal place of business in Lake Charles, Louisiana. Filters, Inc. (Louisiana) became the successor corporation to Lake Charles Filter Service, Inc. in 1974. Testimony of Kenneth R. Thomas. (Hereinafter Testimony of Thomas.)

3. Defendant Filterspun, Inc. ("Filterspun") was a Texas corporation having a principal place of business in Amarillo, Tex-

as. It was acquired by Filters, Inc. (Louisiana) in 1979. Testimony of Thomas.

4. Defendant Filters, Inc. (Texas), is a Texas corporation having a principal place of business in Houston, Texas. Defendant Filters, Inc. (Texas) exists today and is the successor corporation to both Filterspun, Inc. and Filters, Inc. (Louisiana). It was incorporated after the filing of this lawsuit. Testimony of Thomas.

5. Defendants have a regular and established place of business in this judicial district and have sold products alleged to infringe the '779 Patent within this judicial district. Admission of Fact.

6. The '779 Patent issued on November 30, 1971, naming Charles A. Miller, Jr., Robert Miller, Jr. and Joseph B. Masachi as the inventors. Brunswick is now the owner of all rights, title and interest in the '779 Patent. The '779 Patent resulted from a continuation application which relates back to the filing date of the parent application, Serial Number 743485, filed with the United States Patent and Trademark Office on July 9, 1968. Admission of Fact; Plaintiff's Exhibits 1, 114 and 115.

7. The claim of United States Patent 3,624,779 reads as follows:

1. A fluid filter unit adapted for use in a filtering system having a casing for receiving the filter unit and a supporting and sealing means associated with said casing for directing the said fluid through the filter unit, said filter unit comprising:

a. a rigid tubular core having walls pervious to the passage of fluid therethrough;

b. a covering of filter material surrounding a substantial portion of the core;

c. said core having a portion extending beyond at least one end of the covering of the filter material;

d. the extended end of the core having longitudinal corrugations rendering same adaptable for inserting the extended portion in a supporting means of a lesser diameter as compared to said core.

Plaintiff's Exhibits 1 and 17.

8. The patent in suit is directed to a filter unit used in industries requiring precision filtration. These filter units are utilized in industries that manufacture or process foods, pharmaceuticals, chemicals, steel, automobiles and aircraft, to name a few, in literally thousands of applications. The filter units consist generally of a rigid tubular perforated core which is wrapped with a filter material such as cotton or yarn. Testimony of Raymond C. Clark ("Testimony of Clark"); Plaintiff's Exhibit 6.

9. Industries which require precision filtration have employed specialized housings to hold and mount filter units since the turn of the century. The filter units are placed inside the vessel and mounted on a separator plate that divides the vessel compartment into two separate chambers. The contaminated fluid to be filtered enters the vessel on the topside of the plate where the filter or filters are stationed, then migrates through the filter material and perforated core and then through the cap, seat or thimble to the other side of the separator plate and out of the vessel. Testimony of Clark; Plaintiff's Exhibit 146.

10. To insure that no contaminated or unfiltered fluid is allowed to exit the vessel, the filter is anchored in the vessel on the separator plate with the use of devices variously referred to as seats, pedestals, cups or thimbles. The seats upon which the filters are positioned have an upper edge which contacts the filter material of the filter unit. That contact serves both to support the filter unit and to provide a seal between the filter unit and the exit port of the seal. This seal is necessary to prevent unwanted fluid by-pass. The use of these seats to seal and mount filter units on a separator plate within a filter vessel originated in the 1930's. Testimony of Clark; Plaintiff's Exhibits 146 and 205.

11. Since the inception of the use of seats as a standard sealing/support means, the industry has encountered a plethora of

problems in trying to properly mount and seal filter units. Major problems occurred whenever the person installing a new filter, usually a lower-level, relatively unskilled employee, failed to properly align the replacement filter on the seat so that the desired knife-edge seal between the filter medium and upper edge of the seat existed. This misalignment spawned reduced filtration efficiency, contamination of the fluid on the downstream side of the filter and possible damage to the filter unit itself or its host engine or machine. Testimony of Clark; Plaintiff's Exhibit 146, P–16.

12. The industries which employed various precision filtration procedures had invested heavily in filter housings of fairly standard dimensions. The industries half billion dollar investment in standard housings made major modifications to these housings to correct the problems created by misalignment impractical. On the other hand, changes to the filter cartridges themselves were thought to be equally impractical because of the uniform dimensions of the housings. In summation, changes to either the filter unit or housing potentially could have rendered obsolete millions of dollars worth of equipment. Testimony of Clark.

13. Early efforts to find a solution to the filter misalignment enigma and its attendant complications centered on the use of various tube guides or posts. The tube guides turned out not to be the panacea the industry initially expected. Indeed, a new generation of problems was born by their use. Testimony of Clark; Plaintiff's Exhibits 48, 148, 148, P–1–6.

14. Other attempted solutions, such as threaded shafts with mated threaded handles, did not always yield the desired results of precise mounting and alignment or eliminate the problems associated with unwanted bypass. Testimony of Clark; Plaintiff's Exhibits 194, 197, 146, P–24–25.

15. Charles Miller, Jr., Joseph Masachi and Robert Miller, Jr., inventors of the patent in suit, attempted to solve the problem posed by inventing what became United States Patent No. 3,319,793 (" '793 Patent"). That patent claimed:

1. A filter unit including a closed chamber having a fluid inlet and a fluid outlet opening and a separation plate adjacent one end of the chamber wherein, the fluid inlet and fluid outlet openings are on opposite sides of the separation plate, comprising:

(a) a cord wound filter tube having a perforated rigid hollow core extending throughout the entire length of the wound filter tube,

(b) an extension tube of substantially larger diameter than the core and positioned in the wound body of the filter tube and a part extending beyond one end of the filter tube, the portion of the extension tube extending within the filter tube surrounding the said core and spaced outwardly from the sidewall of the core by a plurality of cord windings and a plurality of cord windings extending over the outer surface of the section of the extension member positioned within the filter tube,

(c) a hollow seat thimble of such diameter as to outwardly telescope the end of the extension member extending beyond the end of the filter tube, said seat thimble positioned within an opening in the separation plate and receiving said extension member for supporting the filter tube on the separation plate.

2. A filter tube for a filter unit comprising:

(a) a cord wound filter tube having a perforated rigid core extending throughout the entire length of the filter tube,

(b) a tubular extension constructed of insulating material and of substantially larger diameter than the core having a part positioned in the wound body of the filter tube and a part extending outwardly beyond one end of the filter tube, the portion of the tubular extension extending within the filter tube surrounding the said core and spaced radially outwardly from the sidewalls of the core by a plurality of cord windings and a plurality of cord wrapping

extending over the outer surface of the section of the tubular extension positioned within the filter tube.

The '793 Patent attempted to solve the problems by modifying the filter unit itself. Specifically, the modification consisted of the addition of a separate tubular extension of a diameter larger than the standard core. The extension was designed to fit snugly into the seat or support means. However, because the extension had a diameter larger than the standard core, and because the extension was not compressible, a larger opening in the standard support means was necessary to accommodate the larger extension. The requirement of an enlargement of the standard size support means or seat proved fatal to this invention's success. The industry, having invested much capital in vessels of standard dimensions, refused to modify the seats already in the field to accept the larger diameter extension taught by the '793 Patent. Consequently, this invention was soundly rejected by the industry. Testimony of Clark; Plaintiff's Exhibit 18; Refer to Finding Number 12.

16. Not until July 9, 1968, did Messrs. Miller, Masachi and Miller reach a very simple low-cost approach to the solution in what was to become the '779 Patent. The '779 Patent provided an answer to the problem solely by changing the filter unit itself, obviating the need for extensive modifications to the standard filter vessels already in the field. Specifically, the filter unit was modified by adding an extension with longitudinal corrugations. The longitudinal corrugations provided the desired feature of compressibility, thus allowing a standard size filter to fit into a wide range of seats or other support means already in the field. Not only did this solution eliminate the need for additional parts such as tube guides or specialized seats, but the amount of labor required to accurately replace a filter unit was reduced significantly. It became a simple matter for an inexperienced operator to properly install a cartridge. Testimony of Clark; Testimony of Charles Miller; Plaintiff's Exhibits 1, 19, 130.

17. The '779 Patent contained six references cited by the Patent Office as prior art. The first reference, Timmins United States Patent No. 1,279,611 (1981), is a patent for an oil separator. The Timmins Patent teaches the mounting of a pipe in a casing by threading an end of the pipe to mate with the casing. The Timmins Patent is considerably different from the patent in suit; the only similarity being that they both adapt a filter to a filter housing. Testimony of William G. Easley (Testimony of Easley); Plaintiff's Exhibit 187; Defendants' Exhibit 8.

18. The second reference cited, the Paterson, et al. Patent, United States Patent No. 2,347,927, also teaches a filter that is mounted in a casing by threading an end of the filter. Testimony of Easley; Plaintiff's Exhibit 186; Defendant's Exhibit 14.

19. The third reference cited by the Patent Office, the Kasten Patent, United States Patent No. 3,151,071, discloses a filter unit with a connector that is nonmetallic and noncorrugated. Testimony of Easley; Plaintiff's Exhibit 185; Defendants' Exhibit 26.

20. The Miller '793 Patent, also cited, was discussed in Finding of Fact Fifteen. It teaches an extended core tube with the diameter of the extension being larger than the main core. Additionally, the core is noncorrugated. The '793 Patent tried unsuccessfully to solve the problem eventually solved by the patent in suit. The '793 Patent teaches away from the invention of the '779 Patent. Testimony of Easley; Refer to Finding of Fact 15; Plaintiff's Exhibit 18; Defendants' Exhibit 29.

21. French Patent 630,915, cited by the patent examiner, discloses a leaf-type filtering device consisting of a series of washerlike discs fitted together to form a tubular structure. This device is devoid of longitudinal corrugations. Testimony of Easley; Plaintiff's Exhibit 188; Defendants' Exhibit 33.

22. The last piece of art cited by the patent examiner was Great Britain Patent Number 683,227. That patent discloses a permeable filter having a threaded connector end for mounting of the filter tube in a header plate. That patent differs from the

patent in suit in that it has no corrugations on its extended portion. Testimony of Easley; Plaintiff's Exhibit 190; Defendants' Exhibit 34.

23. No single prior art reference teaches each element claimed in the '779 Patent. Testimony of Easley.

24. None of the prior art discloses a filter core extension which is longitudinally corrugated to provide the feature of compressibility which makes the filter units universally accepted by standardized support means. None of the prior art teaches a filter unit with a longitudinally corrugated extension which can be either one whole element or a separate element connected to the core and which can be utilized with both rigid metal and rigid non-metal cores. Testimony of Clark; Plaintiff's Exhibit 1.

25. The '793 Patent is the most pertinent prior art and it was considered by the Patent Office before granting the '779 Patent. Patent examiner Reuben Friedman examined both the '793 Patent and the '779 Patent, as well as other patents involving filter units. Testimony of Easley; Testimony of Clark; Plaintiff's Exhibits 1, 18, 319, 324, 328, 329 and 330.

26. Defendants cite several references as being more pertinent than those references actually cited by the Patent Office. For example, defendants cite the Donato reference, United States Patent Number 2,792,123, which discloses a repackable filter cartridge that is mounted in a filter vessel by use of a bolt. The Donato Patent does not deal with the problem of mounting a filter on a seat plate as does the patent in suit. Testimony of Easley; Defendants' Exhibit 21.

27. Defendants also cite the Sweetland Patent, United States Patent Number 139,-932, as pertinent prior art. That patent discloses an improvement in stove-pipe joints. It does not teach a filter unit, a tubular core, a rigid core, mounting on a thimble, or corrugations. Testimony of Clark; Defendants' Exhibit 1.

28. Also uncited by the Patent Office but claimed to be pertinent by defendants is the Tice Patent, United States Patent Number 602,448. That patent embodies a filter for rain water. It does not disclose a thimble seat plate, a rigid core or a filter with an extension. The Tice Patent does not deal with the problem of mounting a filter on the seat plate. The only corrugations involved in this invention are located on the rain-gutter pipe that leads into the filter unit that is the subject of the patent. Testimony of Clark; Defendants' Exhibit 3.

29. Defendants cite several references that do not deal with filter units. There is no explicit teaching in any of those references to solve the problem of mounting a filter unit on a seat plate. Testimony of Easley; Defendants' Exhibits 1, 2, 5, 11, 48 (excerpt) and 94.

30. In various post trial materials submitted by defendants, defendants request that the Court consider the Muller Patent, United States Patent Number 2,767,851, in evaluating the validity of the '779 Patent. That patent was admitted into evidence at trial. However, the Court notes curiously that defendants failed to elicit any testimony from any witness regarding that patent's teachings. Further, defendants' expert witness testified that the '793 Patent was more pertinent in several respects than the Donato reference which defendants relied so heavily upon at trial as pertinent uncited art. Accordingly, the Court shall assign appropriate weight to that patent. Defendants' Exhibit 256; Testimony of Easley.

31. The art involved is the design of filter units. The patent in suit is directed to a filter unit adapted for use in a filtering system having a casing for receiving the filter unit and a supporting and sealing means associated with the casing for directing the fluid through the filter unit. Persons of ordinary skill solving problems in this art were those who had a bachelor of science degree in mechanical or chemical engineering with experience in filter unit design. The patented filter unit of the '779 Patent was not obvious to such persons. Indeed, as late as 1980, defendants' expert engineer claimed that it was not obvious to crimp the end of a tube or a tube extension. Testimony of Easley; Testimony of Charles

Miller; Testimony of Clark; Admission of Fact.

32. Between 1974 and 1981, Brunswick sold approximately eighteen and one-half million dollars ($18,500,000) of the filter units that embody the '779 Patent. Plaintiff's Exhibit 132.

33. Defendants have made and sold fluid filter units since 1976. The accused filter units are filter units adapted for use in a filtering system having a casing for receiving the filter unit and a supporting and sealing means associated with the casing for directing the fluid through the filter unit. Specifically, the accused filter units have: (1) a rigid tubular core having walls pervious to the passage of fluid; (2) a covering of filter material surrounding a substantial portion of the core; (3) a part connected to the core which extends beyond at least one end of the covering of the filter material; and, (4) longitudinal corrugations on the part extending beyond the end of the core rendering the accused filter unit adaptable for inserting into a supporting means of a lesser diameter than the core of the accused filter. All of these elements exist in filter units incorporating the '779 Patent. Additionally, the accused filter units perform the same function as the Brunswick patented filter units in substantially the same manner. Admission of Fact; Plaintiff's Exhibits 1 and 5; Testimony of Kenneth R. Thomas.

34. Defendants contend that they avoid infringement because their cores and core extensions are two separate pieces. The two pieces are firmly attached by various methods such as spot-welding, high pressure smashing or mechanical piercing to form one integral unit. The accused filter unit and extender is shipped to a customer as a single element. Further, once properly attached, the extension is not easily removed from the core. Finally, there is no reference in any of defendants' sales materials that the accused filter unit is comprised of a core and a separate adaptor-extension or that this alleged separability feature provides increased flow resistance. Testimony of B.J. Allison; Testimony of James Edward Battle; Testimony of Evelyn Webb;

Testimony of Mary Ingram; Testimony of Easley; Testimony of Thomas.

35. Defendants specifically market the accused filter units as interchanges for the Brunswick extended-core filter element. Indeed, defendants have, on occasion, purchased Brunswick's patented filter units to fill orders for their own customers. Testimony of Frank Lynn Bridges; Plaintiff's Exhibit 14.

36. William G. Easley is the Executive Vice President and General Manager of defendant Filterspun, Inc., and Vice President of defendant Filters, Inc. During the years 1973 and 1974, he was General Manager, Chief Engineer and Director of Operations for Precision Filter of Pampa, Texas. Precision Filter was notified of the existence of the patent in suit in November of 1973. After conducting a review of the patent in suit, Precision Filter determined that the patent was valid and infringed. Consequently, Precision Filter abandoned the production and sale of infringing filter units they manufactured during the time William G. Easley was associated with Precision Filters. Testimony of J.W. Gordon; Testimony of H.C. Abernathy; Plaintiff's Exhibits 118, 119, 204; Joint Pretrial Order Schedule D.

37. Filterspun began selling the accused filter units in 1976. Defendant Filters, Inc. (Texas) is still selling the accused filter units. Both William G. Easley and W.B. Queen, Sales Manager of defendant Filterspun, Inc., and defendant Filters, Inc., made the decision to produce the accused filter units. The decision to make the accused filters was made despite Easley's knowledge that the feature of corrugation on a filter extension would not provide patentability except as a modification of United States Patent Number 3,319,793 and despite his knowledge of Precision Filters decision to honor the Brunswick Patent. Testimony of Easley; Testimony of W.B. Queen; Plaintiff's Exhibit 2.

38. Kenneth Ray Thomas, President of defendant Filters, Inc., became aware of the patent in suit in 1972. He made the decision to continue making the accused

filter units after Filters, Inc. acquired Filterspun, Inc. in July of 1979. Testimony of Thomas.

39. William G. Easley failed to disclose his association with Precision Filter when questioned about his work history in his first deposition in July of 1981. Additionally, defendants produced for Brunswick a copy of a Precision Filter catalog that omitted a page that detailed Easley's connection with Precision Filter. These actions lead the Court to the conclusion that Mr. Easley wished to conceal his association with Precision Filter.

40. Defendants have engaged in other questionable conduct throughout the course of this litigation. For example, William G. Easley made an affidavit stating, *inter alia,* that defendants' core extensions are readily inserted into a filter core to form the accused filter unit and that the same core is easily removed. However, upon closer examination, the evidence reveals two facts to the contrary. First, defendants usually do not manufacture filter units by the method outlined in the Easley affidavit. Second, the cores are not easily removed as stated in the Easley affidavit. The affidavit contained material that was patently untrue. Plaintiff's Exhibit 222. Refer to Finding 34.

41. Other examples of defendants questionable conduct include the failure to produce witnesses for deposition pursuant to a Court order and the failure to produce documents that defendants originally claimed existed. This failure to produce documents known to have existed occurred after the Court ordered both their production and preservation. Additionally, the Court finds particularly disturbing the forty-plus material alterations that were made by defense counsel in the deposition testimony of Kenneth Thomas, defendant's President, well after the deposition was taken. Testimony of Frank Lynn Bridges; Plaintiff's Exhibit 113.

42. Defendants pirated various copyrighted brochures, photographs and charts of the Brunswick Corporation for their own use. Testimony of Easley; Plaintiff's Exhibits 9 and 13.

43. Defendants have copied Brunswick's patented unit and have made no attempt to produce an alternative design. Testimony of Clark; Testimony of Thomas.

## Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. §§ 1338(a) and 2201 (1976). Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) (1980). The defendants have regular and established places of business in this District, and some of the acts charged as infringing the patent in suit have occurred within this District. Refer to Finding of Fact 5.

2. Plaintiff Brunswick is the owner through assignment of the patent in suit and has standing to bring this action. Refer to Finding of Fact 6.

### Validity

3. An invention must satisfy the standards established in the United States Constitution and the conditions set forth in sections 101, 102 and 103 of the Patent Act, 35 U.S.C. § 101–103 (1976), in order to be patentable. It is required that the invention be new or novel, useful, and that the differences between the prior art and the invention be such as to render the invention unobvious to persons skilled in the art at the time the invention was made. *Graham v. John Deere Co.,* 383 U.S. 1, 3–4, 86 S.Ct. 684, 686–87, 15 L.Ed.2d 545 (1966). These requirements must be considered prior to Brunswick's claim for infringement.

4. The '779 Patent, like all patents properly issued, is entitled to a presumption of validity. 35 U.S.C. § 282 (Supp.1982); *Rohm and Haas Co. v. Dawson Chemical Co. Inc.,* 557 F.Supp. 739, 800 (S.D.Tex. 1983). The burden of showing the invalidity of the patent therefore rests upon the defendants. 35 U.S.C. § 282 (Supp.1982). The burden of proof in this regard is more than a preponderance of the evidence and has been described as a heavy one. *Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). The impact of

the presumption of validity is measurably weakened when it is shown that the Patent Office, in making its decision on issuance, did not consider pertinent prior art. *Farmhand, Inc. v. Anel Engineering Industries,* 693 F.2d 1140, 1143 (5th Cir.1982).

5. To be patentable an invention must be novel. 35 U.S.C. § 102. The technical defense of anticipation requires a showing of actual identity in the prior art. However, unless all of the same elements or their equivalents are found in substantially the same situation where they do substantially the same work in the same way, there is no anticipation. *Kori Corp. v. Wilco Marsh Buggies & Draglines,* 708 F.2d 151, 154 (5th Cir.1983) (*quoting, Continental Oil Company v. Cole,* 634 F.2d 188, 195 (5th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981).

6. None of the prior art combines the same elements of the '779 Patent so as to perform the same functions of the '779 invention. Refer to Findings 23–27. Hence, the claim of the '779 Patent was not anticipated by the prior art.

7. The defense of obviousness derives from 35 U.S.C. § 103 (1954) which states that no valid patent will issue if the differences between the invention sought to be patented and the prior art are such that the invention "as a whole would have been obvious to a person having ordinary skill in the art to which said subject matter pertains." *Kori Corp. v. Wilco Marsh Buggies & Draglines, supra,* at 155. Obviousness is a question of law determined upon the following three part factual evaluation: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art." *Rohm and Haas Co. v. Dawson Chemical Co., Inc., supra,* at 806. Other secondary considerations such as commercial success, copying, previous need and the failure of others to solve the problems posed are helpful in determining obviousness or nonobviousness. *Graham v. John Deere Co., supra.*

8. The subject matter as a whole of the invention defined in claim (1) ("one") was not obvious at the time the invention was made to one having ordinary skill in the art of filter unit design. This conclusion is buttressed by the commercial success of the Brunswick filter units, defendants copying and the previously documented failure of other problem solvers to solve the problem. Refer to Findings 13, 14, 31 and 32. Accordingly, the Court is of the opinion that defendants have failed to discharge their burden of proof of overcoming the presumption of validity accorded the patent in suit. Defendants have not successfully proffered any evidence which would cause the Brunswick patent to be held invalid under any statutory provision. Therefore, the '779 Patent is valid and enforceable.

### Infringement

9. Infringement is the unauthorized making, using or selling for use or profit of an invention covered by a valid claim of a patent during the life of the patent. 35 U.S.C. § 271. Generally, in order to constitute infringement, the alleged infringing device must be substantially similar in structure, mode of operation, and results accomplished as the device covered by the patent. *Weidman Metal Masters Co., Inc. v. Glass Master Corp.,* 623 F.2d 1024, 1030 (5th Cir.1980), *cert. denied,* 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 817 (1981). In considering an infringement claim, the Court must first consider "the claims of the patent because the scope of every patent is limited to the invention described in its claims, read in the light of the specifications." *Farmhand, Inc. v. Anel Engineering Industries, supra,* (*quoting Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858, 868 (5th Cir.) *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973)). If the accused matter falls clearly within the claim, infringement is made out and that is the end of it. *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

10. In recognition of the fact that a patent would be virtually worthless if it did not protect against devices which incorporate unimportant variations of the patent,

the doctrine of equivalents was judicially developed to protect the patentee from devices that differ merely in name, form or shape from the patented invention but perform substantially the same function in substantially the same way to obtain the result. *Rohm and Haas v. Dawson Chemical Co., Inc., supra,* at 811 (cites omitted). In other words, a patent need not list every imaginable permutation of its components nor need it anticipate every possible modification developed by those who use it. *Studiengesellschaft Kohle v. Eastman Kodak Co.,* 616 F.2d 1315, 1340–41 (5th Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). Additionally, infringement liability may still exist by making one element out of a plurality of parts. *Duo-Flex Corp. v. Building Service Co.,* 322 F.2d 94, 99 (5th Cir.1963) (infringement was not avoided by the fact that the accused structure utilized main support panels consisting of three pieces instead of constituting a single member).

11. The application of the doctrine of equivalents can be curbed by the invocation of the doctrine of file wrapper estoppel. This doctrine applies if, during prosecution in the Patent Office, the application narrows, surrenders or amends claims to meet obligations of the examiner; the inventor cannot later recapture through the doctrine of equivalents that which he had eliminated from the claims. *Graham v. John Deere Company,* 383 U.S. at 33, 86 S.Ct. at 701. The estoppel applies only to that which was surrendered. *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 870.

12. The accused filter units are clearly within the scope of the '779 Patent, satisfying all the criteria for infringement. The accused filter units are explicitly marketed as interchanges for the Brunswick filter units. In summation, the accused filter units achieve the same result by performing the same function. Refer to Findings 33 and 35.

13. Nothing in the prosecution history of the '779 Patent or the prior art requires that the inventors' claim should be construed to cover only a filter unit formed out of one piece of material rather than two. Neither the inventors nor the patent examiner ever manifested any intention to so limit the claim. Further, in the continuation application, a broad claim was prosecuted rather than a narrow dependent claim that was explicitly limited to a separate piece extension. Defendants' contention that they avoid infringement by joining two pieces to form the functional equivalent of the Brunswick filter unit is without merit.

### Willful Infringement

14. Sections 284 and 285 of Title 35 permit the trial court to increase the award of damages threefold if the infringement is found to be willful or wanton, and in exceptional cases, award attorneys' fees to the prevailing party.

15. Defendants are willful infringers. The defendants explicitly market the accused filter units as "inter-changes" for the Brunswick filter unit. Indeed, on occasion, defendants purchased Brunswick filters to fill their orders. Further, the defendants' President, Kenneth R. Thomas, was aware of the '779 Patent as early as 1972. The defendants' chief engineer, William G. Easley, worked at a corporation in 1974 that quit making infringing filter units once the corporation learned of the '779 Patent and its undoubted validity. Prior to the formation of defendant Filterspun, Inc., Easley was aware of the Brunswick brochures regarding pending patents; yet Filterspun, Inc. conducted no investigation to determine if it was infringing any of Brunswick's patent. Further, defendants proceeded to faithfully copy the extended core filter unit pictured in the Brunswick literature with the legal notification of pending patent rights. Having copied the essential parts of the patented filter unit, knowing the same to be patented and having no good faith belief that the patent is invalid, defendants are willful infringers which entitle Brunswick to double damages. Refer to Findings 34–39, 42, 43.

### Exceptional Nature

16. The prevailing party in a patent infringement case can be awarded attorney's fees if the case qualifies as an "exceptional"

1378

one. 35 U.S.C. § 285; *Livesay Window Co. v. Livesay Ind., Inc.,* 251 F.2d 469, 475–476 (5th Cir.1676). Generally, an award of attorney's fees is justified only if misconduct, unfairness, or bad faith in the prosecution or defense of the patent can be found. *Rohm and Haas Co. v. Dawson Chemical Co., Inc., supra,* at 850. Testimony of a defendant contrary to all documentary evidence amounting to an unconscionable act done with deceptive intent has been held to justify an award of attorney's fees. *Id.*

17. The Court is of the opinion that defendants conduct raises this case to the "exceptional" level. The filing of an affidavit that was contrary to the great weight of the evidence, the material alteration of deposition testimony by defense counsel, and the repeated flouting of Court orders regarding discovery and other matters cannot be condoned by this Court. Accordingly, the Court is of the opinion that Brunswick is entitled to reasonable attorney's fees. Refer to Findings 39–41.

### Injunctive Relief

■ 18. Pursuant to 35 U.S.C. § 283 (1954), Brunswick is entitled to an injunction prohibiting defendants from further infringing of the patent in suit.

### Conclusion

The Court concludes that Brunswick's Patent No. 3,624,779 is valid and enforceable and that such patent was willfully infringed by defendants. Further, the Court finds this to be an exceptional case. As a consequence, Brunswick is entitled to injunctive relief, double damages, and reasonable attorney's fees.

In the event the foregoing Findings of Fact also constitute Conclusions of Law, they are adopted as such. In the event that the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such. It is so ORDERED.